OPINION OF THE COURT
Philip C. Segal, J.
At issue in this child protective proceeding is the adequacy of the trial foundation laid by petitioner to support the admission of validation evidence intended to substantiate the claim that the subject children suffer from sexual abuse syndrome (see, Matter of Nicole V., 71 NY2d 112 [1987]). As follows, the court finds that petitioner failed to establish the expertise of her proffered validator and further failed to establish that the validator’s assessment comported with the specific procedures accepted as reliable within the field (see, People v Wesley, 83 NY2d 417 [1994]). Accordingly, the court concludes that the evidence petitioner offers is not reliable; on that basis, it is excluded.
I
To determine the above issues, a separate hearing was conducted (see, CPLR 4011). At that hearing, petitioner’s validation witness, Dr. Mary Beth Andrews, testified.
Dr. Andrews stated that she holds three degrees: a Bachelor of Arts in psychology, received from Molloy College in 1980; a Master of Science in occupational therapy, received from Columbia University in 1982; and a Doctor of Philosophy in clinical psychology, received from St. John’s University in 1992. According to Dr. Andrews, she initially was licensed to practice clinical psychology in October 1993. To date, her sole professional experience has been as a staff psychologist at St. Christopher-Ottilie, a child care agency in New York City.
Regarding specialized training in child sexual abuse, Dr. Andrews testified that she attended two separate day-long seminars (one in "the spring of 1992”; the other in December 1994). Other than these seminars, Dr. Andrews acknowledged that she never formally studied child sexual abuse in college, graduate school or otherwise. In lieu of additional formal training, Dr. Andrews attends weekly supervisory sessions concerning sexual abuse with a supervisor whose training and experience she could not adequately describe and also attends a monthly discussion group on the same subject. Notwith *443 standing this limited training in a uniquely specialized area of practice, Dr. Andrews stated that she had conducted approximately 60 sexual abuse evaluations in her present position and has been qualified as an expert witness twice in Family Court.
When asked to describe the procedures she utilized in this case, Dr. Andrews testified that, as always, she used a "holistic approach” in which she spoke to and obtained background information from the referring caseworker, including information on "the status of the [respondent natural] parent.” Dr. Andrews then interviewed the children on two separate occasions; each interview lasted between 30 and 60 minutes. During these interviews, Dr. Andrews inquired about family relationships, attempted to assess the children’s mental status, and asked the children to identify human body parts using a photograph of a clothed person she cut out of a Sears, Roebuck and Co. catalog.
Dr. Andrews further explained that she uses anatomically correct dolls and pictures, but only after a child already has "disclos[ed]” sexual abuse during the interview and/or is having "a difficult time expressing [himself or herself].” In her testimony, Dr. Andrews did not describe how the anatomically correct dolls and pictures are used after being introduced.
In addition, Dr. Andrews utilized two separate indexes or outlines (copyrighted by other clinical psychologists) as part of her validation process. First, she completed a Sexual Abuse Schedule Inventory based on information provided by the caseworker; that inventory lists behavior by children that may possibly indicate sexual abuse. Second, she used a Child Post-Traumatic Stress Reaction Index to determine the existence of child post-traumatic stress disorder. This index consists of a series of questions that she posed to the children involving recent upsetting or emotional events. Dr. Andrews stated that she does not "score” this index in the manner its creator intended; rather, she uses it as a "general outline.”
Because of "time constraints”, Dr. Andrews did not interview the respondent father either alone or with the children. Dr. Andrews explained that she rarely interviews the alleged perpetrators of sexual abuse. In her view, this does not affect the validity of her assessment.
Finally, Dr. Andrews followed her customary practice and did not audio record her interviews with the children. She considers such audio recording to be overly "distracting”. *444 Instead, she takes notes during the interviews which she considers to be an adequate record of what transpired.
Dr. Andrews repeatedly stated that she could not identify the procedures generally accepted in the field as reliable for validating the existence of sexual abuse syndrome in children. As a result, even though she described the procedures she had used, Dr. Andrews was entirely unable to explain how they comport with the generally accepted methodology or to describe her rationale for using them. Rather, Dr. Andrews opined that sexual abuse syndrome is insufficiently "documented” and stated that her purpose as a validator is only to determine "whether or not a child’s [out-of-court allegations of sexual abuse] are credible” — not to address the existence of the syndrome itself.
Regarding the protocol she used, Dr Andrews: (i) noted that "some” validators interview the alleged perpetrator but offered no explanation for not doing so in this case other than her statement that such an interview was precluded by "time constraints”; (ii) did not know of the accepted procedures for when to use anatomically correct dolls or pictures; (iii) was unaware of whether the two indexes she used are part of the standard protocol and did not know of the research, if any, supporting their use; and (iv) did not address the audio recording of interviews with the children as a part of the accepted protocol.
II
Before the testimony of an expert witness can be received in evidence, the party seeking to offer that evidence has the burden of demonstrating the qualifications that make the witness an expert. (Meiselman v Crown Hgts. Hosp., 285 NY 389 [1941].) Because there are no absolute rules automatically defining whether a witness is an expert or not, various combinations of education, training, observation or experience may suffice. (Supra, at 398.) However, the witness necessarily must be qualified in the specific subject at issue. (See, Fisch, New York Evidence §§ 418, 428 [2d ed 1977].) The Trial Judge determines in the exercise of discretion whether expertise has been sufficiently demonstrated to warrant admission of the testimony. (Meiselman v Crown Hgts. Hosp., supra, at 398-399.)
Here, although Dr. Andrews holds a doctorate in clinical psychology and is licensed to practice that profession in New York State, her qualifications as a sexual abuse validator fall *445 far short of what is required. (See generally, Gallet, Judicial Management of Child Sexual Abuse Cases, 23 Fam LQ 477 [1989].) Participation in two day-long seminars is, by itself, insufficient. That Dr. Andrews previously was qualified as an expert in Family Court, that she has received some additional supervision and that she has had some relevant experience during a relatively brief time span do not, without more, appreciably enhance her expertise. Notably, Dr. Andrews could not detail the content of her supervision or the credentials of her supervisors. Finally, and perhaps of greatest significance, Dr. Andrews’ lack of expertise was demonstrated by her unfamiliarity with the validation protocol accepted in the field as reliable.
Contrary to the requirements of People v Wesley (supra), petitioner never proved that protocol in any other way. Absent such proof, the court is unable adequately to measure the procedures Dr. Andrews used by a common standard or to assess whether her conclusions represented anything more than a subjective belief or unsupported speculation.
In contrast to the recommended practices as set forth in existing precedent and published authorities, it appears that Dr. Andrews used procedures that actually were deficient in at least four important respects:
1. In its guidelines for the clinical evaluation of child sexual abuse, the American Academy of Child and Adolescent Psychiatry stresses that "[i]t is important to obtain a history from the perspective of each parent.” (American Academy of Child and Adolescent Psychiatry, Guidelines for the Clinical Evaluation of Child and Adolescent Sexual Abuse, j[ 6 [1988] [hereinafter Academy Guidelines].) Nonetheless, Dr. Andrews did not obtain such a history from respondent.
2. The use of anatomically correct dolls has created "intense controversy” within the validation field. (Newman, Assessing the Quality of Expert Testimony in Cases Involving Children, 22 J Psychiatry & L 181, 198 [1994].) Some courts have rejected testimony based on the use of such dolls because the methodology for using them is not yet scientifically established (e.g., In re Christie D., 206 Cal App 3d 469, 253 Cal Rptr 619 [Cal Ct App 1988]; In re Amber B., 191 Cal App 3d 682, 236 Cal Rptr 623 [Cal Ct App 1987]; United States v Gillespie, 852 F2d 475 [9th Cir 1988]). Other courts have endorsed their use (e.g., State v Oslund, 469 NW2d 489 [Minn Ct App 1991]; Commonwealth v Lewandowski, 22 Mass App Ct 148, 491 *446 NE2d 670 [1986]; Matter of Rinesmith, 144 Mich App 475, 376 NW2d 139 [1985]). New York courts have referred to the use of anatomically correct dolls, but have not directly addressed the issue of their scientific acceptance (e.g., Dutchess County Dept. of Social Servs. v Margaret F., 186 AD2d 254, 255 [2d Dept 1992]; Matter of Lauren KK., 175 AD2d 393 [3d Dept 1991]; Matter of Chianti FF, 163 AD2d 688 [3d Dept 1990]). Assuming, without deciding, that evidence resulting from the use of such dolls is admissible under the principles set forth in People v Wesley (supra), the Academy’s guidelines emphasize that "[c]are should be taken not to use these dolls in a way to instruct, coach, or lead the child. Furthermore, they should not be used as a short cut to a more comprehensive evaluation of the child and the child’s family.” (Academy Guidelines, op. cit, [f 11.) Other authorities explain that standardized anatomically correct dolls should be introduced with a non- or low-verbal child only after a period of free play in a room "setup with other toys on the floors (cars and trucks, a doll house, two play telephones, markers and papers, etc.) and the dolls on a chair at the back of the room”; only then should the dolls be used to help elicit the child’s terminology for body parts and to allow the child to demonstrate what happened. (25 Am Jur 3d, Proof of Facts, Child Sexual Abuse, § 18 [1994].) A single doll should not be used; rather, at least four adult and four child dolls should be used so that the child can describe his or her own situation "including significant adults other than the parents and taking into account the possibility [that the abuser is] a sibling or a peer.” (Id.) Again, the evidence does not demonstrate that Dr. Andrews followed these practices.
3. "As a matter of sound interviewing methodology, nearly all experts agree that” pretrial interviews of alleged child sex abuse victims should be recorded to reduce the danger that the children’s recollection is tainted by suggestive questioning. (State v Michaels, 136 NJ 299, 314, n 1, 642 A2d 1372, 1379, n 1 [1994]; see also, Idaho v Wright, 497 US 805, 813 [1990]; cf., Family Ct Act § 1038 [c].) Recording interviews also helps to provide independent evidence for the court’s assessment of the expert’s conclusions. (Id.; State v Michaels, supra.) Indeed, "the existence of a video or sound recording of a statement elicited through pretrial interrogation is a factor bearing on its reliability.” (Supra, at 314, 642 A2d, at 1379.) As stated, Dr. Andrews testified that she did not record her interviews *447 because it would have been "distracting” to the children. Rather, she made notes in front of the children, which the court concludes is a far more distracting practice. The failure to record the interviews was a significant departure from accepted validation procedures.
4. The court notes that Dr. Andrews chose to use a picture from a department store catalog rather than a standardized model for her evaluation. While the picture may have been appropriate, the court has no assurance that it was not improper or otherwise suggestive.
Finally, Dr. Andrews did not seek to address the central issue identified in Matter of Nicole V (supra), upon which expert validation testimony is authorized: whether the subject child(ren) suffer from sexual abuse syndrome. Because Dr. Andrews focused on the "credibility” of the children instead of addressing whether they manifest the syndrome, her proffered testimony, if admitted, would usurp the role of the trier of fact; as such, it is also inadmissible as a matter of law. (People v Parks, 41 NY2d 36, 48 [1976]; People v Fogarty, 86 AD2d 617 [2d Dept 1982]; Matter of Sanchez, 141 Misc 2d 1066 [Fam Ct, Bronx County 1988]; accord, State v Michaels, supra, 136 NJ, at 321, 642 A2d, at 1383.)
Allegations of child sexual abuse are among the most serious charges that can be made. It is the court’s responsibility to protect children from such conduct where competent evidence indicates that it has occurred; and it is likewise the court’s responsibility to protect the accused where no such evidence is offered. As observed in Matter of Smith (133 Misc 2d 1115, 1116 [Fam Ct, Queens County 1986], affd 128 AD2d 784 [2d Dept 1987], lv denied 69 NY2d 613 [1987]), "a child abuse finding against a parent or parents where no child abuse has occurred is as harmful and as devastating to the subject child as is the failure to find child abuse where such has occurred.” This court has carefully evaluated Dr. Andrews’ expertise and the techniques she used in order to determine whether the evidence she seeks to offer would be reliable, and determines that her validation evidence is wholly incompetent. As such, its receipt would hinder the fact-finding process and ultimately impair the best interests of the children. In view of the foregoing, it will not be received.