Jeffrey WASHINGTON, Petitioner–
Appellant,

v.

Sunny SCHRIVER, Superintendent,
Wallkill Correctional Facility,
Respondent–Appellee.

No. 00–2195.

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 2000.

Decided Jan. 5, 2001.

Amended June 15, 2001.

John R. Cuti, Emery Cuti Brinckerhoff & Abady PC, New York, NY, (Ilann M. Maazel, Paul Skip Laisure, on the brief), for Petitioner Jeffrey Washington.

Nancy D. Killian, Assistant District Attorney, Bronx County, NY, for Robert T. Johnson, District Attorney, Bronx County (Joseph N. Ferdenzi, Assistant District Attorney, on the brief), for Respondent Sunny Schriver.

Before CARDAMONE, CALABRESI, and KATZMANN, Circuit Judges.

Judge CALABRESI concurs in a separate opinion.

KATZMANN, Circuit Judge:

Petitioner Jeffrey Washington was convicted in Bronx County Supreme Court of raping his then five-year-old daughter while she visited him for the weekend of April 13–14, 1991. The petitioner did not deny that his daughter had been sexually abused, but contended that she had been raped by someone else and then coached by her mother, and perhaps also her godmother, to blame the crime on him. To buttress this contention, he sought to introduce expert testimony on the suggestibility of young children when subjected to certain leading and suggestive interviewing techniques. The trial court excluded the expert testimony on various grounds, including a lack of factual foundation for the testimony, the fact that the expert witness had not been qualified previously in a New York court, and a finding that the subject of the proposed testimony was not beyond the knowledge of the average juror. The petitioner argued to the trial court and subsequently to the Appellate Division that the exclusion of this testimony violated his rights under the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the

Sixth Amendment, both of which guarantee a criminal defendant the right to call witnesses to present a meaningful defense. This constitutional argument was apparently rejected, although neither state court specifically addressed the federal issues. The petitioner sought relief in federal court, but the district court denied the petition. *See Washington v. Schriver,* 90 F.Supp.2d 384 (S.D.N.Y.2000) (Buchwald, *Judge* ). He now appeals to this court raising two issues: (1) no deference is owed under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to the state courts' denial of his federal constitutional claim because the state courts did not address the merits of that claim, and (2) the exclusion of the expert testimony violated his constitutional right to call witnesses and present a defense. For the reasons stated below, we decline to decide whether the petitioner's federal claim was "adjudicated on the merits" within the meaning of AEDPA, because under either AEDPA or a *de novo* standard of review, we must affirm the denial of his application for habeas corpus relief.

## BACKGROUND

### 1. The Evidence at Trial

Beginning on June 25, 1993, the petitioner was tried before a jury in Bronx County Supreme Court. The testimony at trial established the following:

Jane,[1] the daughter of Sally Smith and the petitioner Jeffrey Washington, was born on February 4, 1986. Her parents did not marry, and Jane rarely saw her father for the first three years of her life. In 1990, Sally Smith and the petitioner resumed a romantic relationship. At first, the petitioner would visit his daughter and

her sister Natoya at the apartment where the children lived with their mother. The apartment was also occupied by Jane's godmother Clara Jamison, Ms. Jamison's daughters Gloria and Linda and their children. Ms. Smith and her two daughters lived in the living room, separated from the other parts of the apartment by a hanging curtain. Ms. Smith often left Jane in the apartment when she attended school or went to social events at night, but she testified that she always made sure that Ms. Jamison was there to take care of Jane. However, Ms. Smith admitted that when she left Jane home at night, Jane would sleep in the living room without Ms. Jamison.

The petitioner's relationship with Ms. Smith was apparently somewhat rocky. Ms. Smith testified that they would fight when the petitioner questioned her daughters about what she (Ms. Smith) did and about who came and went from her apartment; they also argued about issues related to the children. The petitioner testified that they argued about his romantic attachments with other women; men being in the apartment where Ms. Smith lived with her daughters; the way Ms. Smith spent money that the petitioner had given her to use for the children; and what he perceived to be the children's poor hygiene.

Sometime after the petitioner reinitiated a relationship with his daughter, Jane and Natoya began to spend weekends with the petitioner at the apartment he shared with his mother. On Thursday April 11, 1991, Jane arrived to spend the weekend with the petitioner; Natoya arrived the next day. Jane and Natoya typically slept in a room with their three cousins, the petitioner's nieces. But Jane testified that on the

---

1. To protect the privacy of the victim, we use pseudonyms for her and her mother through- out this opinion.

last night she was there, the night of April 13, her father had her sleep in the living room with him. Jane further testified that during that night, the petitioner put his penis in her vagina and her mouth, and put his fingers in her vagina. According to Jane, the petitioner told her not to tell anyone and threatened hurt her and her mother if she did. The petitioner took the stand and denied the accusations against him.

Ms. Smith testified that the day after Jane returned home, she complained of a stomach ache and a sore throat. She also testified that starting a week after that, Jane was more withdrawn and aggressive than usual, and appeared uncomfortable around her father.

Jane's godmother, Ms. Jamison, testified that on April 29, 1991 Jane told her that she "had been raped." Ms. Jamison did not describe the exact words Jane used, and did not testify that Jane named her father as the rapist. Because Jane admitted that her mother taught her the word "rape" after the incident, Ms. Jamison's testimony must be presumed to be a paraphrase of whatever Jane actually said. Ms. Jamison was not asked whether she questioned Jane either before or after her report of abuse.

On the night of April 30, the day after Jane made her statement to Ms. Jamison, Ms. Smith took her daughter to the police precinct to report the abuse. Ms. Smith testified that she informed the police that her daughter had told her of the incident the day before, on April 29. However, the parties stipulated that a police officer would have testified, had he been called, that Ms. Smith told him on April 30 that she had only learned of the abuse that day. At the precinct, Jane was interviewed by an unknown number of police officers.

After leaving the precinct on the 30th, Ms. Smith took her daughter to Mount Sinai Hospital to be examined. The doctor who conducted the examination was not called to testify, but the medical report was entered into evidence. The April 30 report did not mention any damage to the hymen such as tearing, scarring or thinning, but did note that Jane had "mild red erythema," a term meaning redness, around the vaginal opening. The prosecution's medical witness testified that such redness was "nonspecific," meaning that it was associated with sexual abuse but could also be explained by other factors such as irritation from soap or poor hygiene.

On May 1, 1991, Jane was again interviewed by a police officer. During that day, Jane was also interviewed by Myriam Moreno, an Assistant District Attorney, and told the ADA that the incident had occurred while her sister was at school, in other words, during the daytime. However, Moreno testified that during a later interview Jane said the incident occurred at 2 a.m. Also on May 1, the petitioner was arrested for raping Jane and held in jail because he could not make bail.

On May 2, Ms. Smith took Jane to see Fredericka Tolbert, a case worker at the Bureau of Child Welfare. Although Jane denied this on cross-examination, Ms. Tolbert testified that when she first asked Jane whether anyone had touched her, she said "nobody," and when she asked her a second time, "[s]he said mommy touched me." In response to questioning by the prosecutor, Ms. Tolbert testified that, in her experience, when young children say that mommy touched me, they mean "she wiped me . . . she bathed me." Jane testified that later in the interview, when Ms. Tolbert asked her specifically whether her father Jeffrey had touched her, she said that he had. The police investigation was closed on May 2.

On May 3, 1991, a second physician at Mount Sinai examined Jane. The prosecution did not call this physician to testify either. The physician's report was entered into evidence, and the prosecution's doctor testified on cross-examination that the report specifically noted that although there was some redness in the vaginal area and a notation of "slight thinning" on the left side of the hymen, there were "no hymenal tears." The hymen orifice measured five millimeters.

On June 4, 1991, more than one month after the arrest of the petitioner and one and a half months after the alleged abuse, Jane was examined by a different doctor, Dr. Linda Cahill of the North Central Bronx Hospital. Dr. Cahill was the prosecution's sole medical witness at trial. On June 4, Dr. Cahill observed a healed tear, "some thickened tissue," and an irregular border on the hymen, and testified that these findings specifically indicated sexual abuse. The doctor could not identify the time at which these injuries occurred, but she testified that they happened approximately two or more weeks before her examination, which was, as the petitioner notes, as much as two weeks after he was in jail. The hymen orifice was now larger than it was on May 3, measuring six to seven millimeters. Dr. Cahill opined that her findings on June 4 were not inconsistent with the earlier medical examinations.

The petitioner's defense was that another man had sexually abused Jane and that Ms. Smith (and perhaps Ms. Jamison as well) had convinced Jane that the petitioner was the abuser. To this end, he elicited the testimony discussed above about his difficult relationship with Jane's mother, the mother's failure to report the abuse for a day and her apparent lies, and the medical evidence suggesting the abuse had occurred after the petitioner was incarcerated. In addition, the petitioner put a neighbor of Ms. Jamison's on the stand, a woman named Alice Lesane. Ms. Smith had earlier testified that no men ever spent the night at Ms. Jamison's apartment even though several young women who lived there had boyfriends. However, Ms. Lesane testified that men named Exxon, Randy Sesom and Douglas lived in the apartment and that the night before she testified at the petitioner's trial, Ms. Jamison had asked her (Ms. Lesane) to lie about this fact during her testimony.

## 2. The Exclusion of the Expert Testimony

Prior to trial, the petitioner moved to qualify as an expert witness Dr. Steven Thurber, a psychologist who specializes in the field of child memory. He proposed to testify that children under seven have trouble separating appearances from reality; that leading questions about sexual abuse and other subjects can cause young children to adopt information contained in the questions as remembered fact; that the use of anatomically correct dolls is unduly suggestive; and that the interrogation techniques used in this case by detectives, a social worker, assistant district attorneys, and doctors were leading and suggestive. The trial judge denied the initial motion and a motion to reconsider, giving several reasons: Dr. Thurber had never been qualified as an expert in New York; a young child's potential suggestibility is well within the knowledge of the average juror; the expert testimony was offered to comment on the witness's credibility, an area in which the jury has the exclusive duty to evaluate; the testimony was "soft scientific testimony at best"; no foundation was laid showing that suggestive questions were asked in this case; and the victim named the defendant as the perpetrator before she was brought to the police, meaning that no foundation was laid for the influence of suggestive questioning.

After a mid-trial motion to reconsider the exclusion of Dr. Thurber was denied, the petitioner's counsel put on the record that had the court not decided prior to trial to exclude the testimony, he would have tried the case differently. For example, he "would have much more extensively gone into the Grand Jury testimony of the child witness with the child on cross-examination so that the jury could see the leading nature of the interrogation and the suggestive conduct of ADA Pearl who presented the case in the manner in which he used the [anatomically correct] dolls in the Grand Jury." However, given the court's pre-trial exclusion of the testimony, defense counsel decided not to go into the grand jury testimony for fear of putting in front of the jury prior consistent statements by the victim.

### 3. The Verdict

The jury convicted the petitioner of Rape in the First Degree, N.Y. Penal Law § 130.35[3], Sodomy in the First Degree, N.Y. Penal Law § 130.50[3], and Sexual Abuse in the First Degree, N.Y. Penal Law § 130.65[3]. He was sentenced to concurrent terms of imprisonment of six to eighteen years for rape and sodomy and two and one-third to seven years for sexual abuse.

### 4. State Court Appeals

The petitioner appealed his conviction, arguing that he was denied his statutory right to a speedy trial, the indictment was improperly amended, and the exclusion of the expert testimony was erroneous and violated his federal constitutional right to call witnesses and present a defense. The Appellate Division affirmed. See People v. Washington, 238 A.D.2d 263, 657 N.Y.S.2d 24 (1st Dep't 1997). Regarding Dr. Thurber's exclusion, the court stated:

The court properly denied defendant's request to present the testimony of an expert on the susceptibility of young children to suggestion. This subject was not beyond the knowledge of the jurors, and, in any event, the child revealed the incident prior to any prodding or questioning by anyone and any deficiencies in her memory and the effects of any suggestibility were presented to the jury through cross-examination and summations and were the subject of proper jury instructions.

Id. at 264, 657 N.Y.S.2d 24 (citing New York state cases applying New York evidentiary law).

Leave to appeal to the Court of Appeals was denied. See People v. Washington, 90 N.Y.2d 944, 687 N.E.2d 659, 664 N.Y.S.2d 762 (1997).

### 5. Federal Habeas Corpus Proceedings

The petitioner sought relief in federal court, arguing that AEDPA does not mandate deference to the state courts' denial of the federal constitutional claim in this case because the state courts did not address the merits of that claim, and that the exclusion of the expert testimony violated his constitutional right to call witnesses to present a meaningful defense. The petition was referred to a magistrate judge who recommended denying the writ. Over the petitioner's objections, the district court adopted the recommendation and denied relief. See Washington v. Schriver, 90 F.Supp.2d 384, 386 (S.D.N.Y.2000).

The district court rejected the petitioner's argument that a summary denial of a federal constitutional claim does not qualify for deference under AEDPA by quoting from Arizona v. Evans, 514 U.S. 1, 7, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), which warned against the "unsatisfactory and intrusive practice of requiring state courts to clarify their decisions" by citing to federal

precedents. *Washington*, 90 F.Supp.2d at 386. Relying on *Evans*, the court concluded that "[i]n the final analysis, federal habeas review must be governed by the holding of the state court—not the form of its articulation." *Id.*

On the merits, the district court emphasized that the petitioner had been "unable to point to any [federal cases] that find a failure to [admit expert testimony on children's suggestibility] to be constitutional error." *Id.* at 388. Second, the court noted that it is within the discretion of the trial court to exclude expert testimony concerning matters of common knowledge to the jury, and applying AEDPA, could not find that the state courts' decision in this regard was unreasonable. *See id.* at 389. Third, the court found that even if the state courts had confused the issues of witness credibility and reliability—the latter but not the former being the proper province of expert witness testimony—the state court decision was still reasonable because the trial court had the discretion to exclude expert testimony on areas of common knowledge to the jury. *See id.* at 389–90. Finally, the district court held that even if there had been error it was harmless because the jury received information about suggestibility on cross-examination of the victim and in defense counsel's summation. *See id.* at 390.

## DISCUSSION

We have jurisdiction under 28 U.S.C. § 2253(a), and we review *de novo* the district court's denial of habeas corpus relief. *See Lurie v. Wittner*, 228 F.3d 113, 121 (2d Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001); *Chal-*

*mers v. Mitchell*, 73 F.3d 1262, 1266 (2d Cir.), *cert. denied*, 519 U.S. 834, 117 S.Ct. 106, 136 L.Ed.2d 60 (1996).

### A. AEDPA's "Adjudicated on the Merits" Requirement

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA), P.L. No. 104–132, 110 Stat. 1214, which "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, J.).[2] In pertinent part, codified at 28 U.S.C. § 2254(d) (2000), AEDPA states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The petitioner contends that his federal constitutional claim was not "adjudicated on the merits" because the state courts neither cited nor applied federal law, not relied upon precedents which in turn cited or applied federal law. As a consequence, the petitioner argues that AEDPA's deferent standard of review of state court deter-

---

**2.** Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia, Kennedy and Thomas, delivered the opinion of the Court regarding the interpretation of 28 U.S.C. § 2254(d)(1)'s standard of review. Justice

Stevens delivered the opinion of the Court regarding whether the petitioner received constitutionally-ineffective assistance of counsel. *See Francis S. v. Stone*, 221 F.3d 100, 108 (2d Cir.2000).

minations does not apply, and that we should review his claim under pre-AEDPA standards. The respondent replies that the federal claim was "adjudicated on the merits" within the meaning of AEDPA because it was considered and denied by the state courts, albeit without an explicit reference to the federal constitutional aspects of that particular claim.

The petitioner asks us to reach and resolve a difficult question that has divided the Courts of Appeals. *Compare, e.g., Bell v. Jarvis,* 236 F.3d 149, 163 (4th Cir.2000) (en banc), *petition for cert. filed* (U.S. Mar. 29, 2001) (No. 00–9290); *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999); *and Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999), *with Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1365, 149 L.Ed.2d 293 (2001). Without the benefit of a fully developed legislative record, courts have reached different conclusions as to the meaning of "adjudicated on the merits."

On one view, AEDPA directs federal habeas courts to ascertain whether a state court adjudication has "resulted in a decision," 28 U.S.C. § 2254(d)(1), that is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts. *See, e.g., Aycox,* 196 F.3d at 1177. That is, federal habeas courts are to evaluate the state court result, and not the reasoning process. Thus, a state court's summary decision not explicitly addressing a federal claim would be evaluated under AEDPA and upheld "unless [an] independent review of the record and pertinent federal law," *id.* at 1178, leads to the conclusion that the result failed to satisfy the § 2254(d) standard of review. *See also, e.g., Bell,* 236 F.3d at 158. This approach, which essentially finds that "ad-

judicated on the merits" should be defined as "decided by a judicial officer on the merits and reduced to judgment accordingly," asserts that with AEDPA, Congress sought to reduce federal court supervision of the state's criminal processes and increase deference to state judicial decisions. In addition, this approach has been justified by citing to Black's Law Dictionary which defines "adjudication" as "[t]he formal giving or pronouncing a judgment or decree in a court proceeding." *Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.), *cert. denied,* 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998). Congress, on this view, may also have had in mind the well-settled meaning of "adjudicated on the merits" as used in the *res judicata* context in civil litigation. This approach, under which even the most summary orders disposing of federal claims without comment are adjudications on the merits, would be consistent with pre-AEDPA precedent teaching that federal habeas courts should be wary of "impos[ing] on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim." *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Capellan v. Riley,* 975 F.2d 67, 72 (2d Cir.1992) (federal habeas courts should not place themselves "in the position of dictating to state courts that they must issue opinions explicitly addressing the issues presented or else face 'second guessing' by the federal courts").

Another approach would find that unexplained, summary dismissals of federal claims are not "adjudicat[ions] on the merits." This approach looks to the view of at least six justices in *Williams v. Taylor* that the substance of the state court decision should be examined in order to determine which clause of § 2254(d)(1) to ap-

ply [3] and whether the state court decision was "contrary to" or involved an "unreasonable application of" federal law.[4] That analysis, the argument proceeds, cannot be performed if the state court decision does not identify in some fashion the legal rule through which the result was reached. This approach to the statute infers from *Williams* that Congress's direction that § 2254(d) only applies to claims that were "adjudicated on the merits" by the state courts means that such "adjudication" only takes place when the state court decision makes its rationale (the legal rule it applied) at least minimally apparent. *See Hameen*, 212 F.3d at 248. This approach points out that the challenge of defining "adjudicated on the merits" is all the greater because the statute uses "judgment," "decision" and "adjudication of [a] claim," 28 U.S.C. § 2254(d), without specifying the meaning of—and differences among, if any—these terms. In enacting AEDPA, Congress sought to "curb delay[ ]." *Williams*, 529 U.S. at 386, 120 S.Ct. 1495 (opinion of Stevens, J.); *see also id.* at 404, 120 S.Ct. 1495 (opinion of O'Connor, J., for the Court) (same). On this view, when the state court decision provides some sense of its reasoning, it promotes an overall more efficient use of judicial resources and a speedier and more accurate resolution of habeas petitions. Thus, according to this approach, it could

obviate the need for the sometimes complicated analysis that arises when a federal habeas court cannot determine whether a state court decided a claim on substantive or procedural grounds. As to accuracy, even a court that interpreted "adjudicated on the merits" to require only an analysis of the bottom-line ruling of the state court recognized that "it is far preferable if the state court explains its reasoning because then we are not forced to guess as to the reasoning behind a determination. A state court's explanation of its reasoning would avoid the risk that we might misconstrue the basis for the determination, and consequently diminish the risk that we might conclude the action unreasonable at law or under the facts at hand." *Aycox*, 196 F.3d at 1178 n. 3. On this view, as the Supreme Court has recognized in a related context, when a state court issues "an unexplained order (by which we mean an order whose text or accompanying opinion does not disclose the reason for the judgment) ... [a]ttributing a reason is ... both difficult and artificial." *Ylst v. Nunnemaker*, 501 U.S. 797, 802–03, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *cf. Coleman*, 501 U.S. at 733, 111 S.Ct. 2546 (applying the adequate and independent state ground doctrine in the habeas context in a manner that "minimize[s] the costs associated with resolving ambiguities in state court decisions").[5]

3. *See Williams*, 529 U.S. at 406, 120 S.Ct. 1495 (opinion of O'Connor, J., for the Court); *see also id.* at 407–08, 120 S.Ct. 1495.

4. Those supporting this approach look to the separate opinions by Justice Stevens, *see Williams*, 529 U.S. at 394, 395, 397–98, 120 S.Ct. 1495, Justice O'Connor, *see id.* at 414–16, 120 S.Ct. 1495, and the Chief Justice, *see id.* at 417–19, 120 S.Ct. 1495, all of which analyze the reasoning process used by the state courts.

5. The approach discussed in the above paragraph also seeks support in an opinion by

Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, which advocated adopting, for the habeas context, reasonableness review of state court adjudications of certain federal constitutional claims. *See Wright v. West*, 505 U.S. 277, 287–95, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). Justice Thomas's conception of deference in *Wright* arguably appears to contemplate deferring to a reasoned state court explication of a federal claim. *See, e.g., id.* at 288, 112 S.Ct. 2482. Some have contended that the new § 2254(d) codifies or at least is based in part on Justice Thomas's opinion, although there is no explic-

We need not and do not resolve today the question of whether § 2254(d)'s standard of review applies because nothing turns on it here. Indeed, as discussed below, even reviewing the state court's resolution of Washington's federal constitutional claim *de novo*, as *Hameen* suggests we must, we hold that the district court properly denied the petitioner's application for a writ of habeas corpus.

## B. The Merits of Petitioner's Constitutional Claim

### 1. Standard of Review

■ Assuming *arguendo* that the petitioner's due process claim was not adjudicated on the merits, we apply the pre-AEDPA standard of review which accords less deference to a state court's resolution of a federal constitutional issue. Prior to AEDPA, pure questions of law and mixed questions of law and fact were reviewed *de novo*. *See Williams,* 529 U.S. at 400, 120 S.Ct. 1495 (opinion of O'Connor, J.) (citing *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). Under pre-AEDPA standards the factual findings of the state courts were "presumed ... correct" absent special circumstances listed in the statute. *See* 28 U.S.C. § 2254(d) (1994). The presumption applied to historical facts and inferences drawn from them, *see Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.), *cert. dismissed,* 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986), and to the factual findings of state appellate courts as well as trial courts, *see Wain-*

*wright v. Goode,* 464 U.S. 78, 85, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (per curiam) (citation omitted). The presumption curtailed a federal court's ability to substitute its judgment as to the credibility of witnesses for that of the state court. *See Maggio v. Fulford,* 462 U.S. 111, 113, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam) (citing *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)).

■ One of the reasons the presumption can be set aside is if the federal habeas court "on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994); *see also Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). This standard means that the federal habeas court must "more than simply disagree" with the state fact-finding. *See Marshall,* 459 U.S. at 432, 103 S.Ct. 843. If the state record is "ambiguous" such that two different views of the facts find fair support in the record, section 2254(d)(8) mandates deference to the state court's fact-finding. *See Wainwright,* 464 U.S. at 85, 104 S.Ct. 378.

■ Even if "a state court determination is fairly supported by the record, and thus presumed correct, [the] petitioner in a federal evidentiary hearing may nonetheless prevail by shouldering the burden of establishing 'by convincing evidence that the factual determination by the State

it reference in the legislation or the accompanying reports to the *Wright* case. *See The Supreme Court, 1999 Term—Leading Cases,* 114 Harv. L.Rev. 319, 325 (2000); Brian M. Hoffstadt, *How Congress Might Redesign a Leaner, Cleaner Writ of Habeas Corpus,* 49 Duke L.J. 947, 1033 (2000); Peter W. Low & John C. Jeffries, Jr., Federal Courts and the Law of Federal-State Relations 741 (4th ed.1998); *see also Williams,* 529 U.S. at 410–

11, 120 S.Ct. 1495 (opinion of O'Connor, J., for the Court) (implying that Congress may well have codified Justice Thomas's *Wright* opinion in AEDPA); but *see id.* at 380 n. 11 & 387 n. 14,, 120 S.Ct. 1495 (opinion of Stevens, J.) (disagreeing that AEDPA codifies the Justice Thomas approach in *Wright* but acknowledging that "[i]t is not unusual for Congress to codify earlier precedent in the habeas context.").

court was erroneous.'" *Ventura v. Meachum,* 957 F.2d 1048, 1054 (2d Cir.1992) (quoting *Lafferty v. Cook,* 949 F.2d 1546, 1549 n. 1 (10th Cir.1991), in turn quoting 28 U.S.C. 2254(d)).

#### 2. The Constitutional Framework

■ The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *See Taylor v. Illinois,* 484 U.S. 400, 408–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *California v. Trombetta,* 467 U.S. 479, 486 n. 6, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *cf. Rock v. Arkansas,* 483 U.S. 44, 51–52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (holding that the right to testify in one's own defense is rooted in the Sixth and Fourteenth Amendments). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038 (citing, *inter alia, Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)). The right is not, of course, unlimited; the defendant "must comply with established rules of procedure and evidence designed to assure both ʾfairness and reliability." *Id.; see also Taylor,* 484 U.S. at 410, 108 S.Ct. 646 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). "Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right" to present a meaningful defense. *Agard v. Portuondo,* 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). Nevertheless, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness. In *Chambers,* for example, the Supreme Court found that the state court's refusal to allow hearsay statements to be admitted as declarations against penal interest rose to the level of constitutional error, even though at the time many state courts as well as the federal system did not recognize that exception to the hearsay rule. *See Chambers,* 410 U.S. at 299–302, 93 S.Ct. 1038.

■ The *Taylor–Chambers* case law has been applied to the exclusion of expert witnesses. *See Agard,* 117 F.3d at 705; *Ronson v. Commissioner of Correction,* 604 F.2d 176, 178–79 (2d Cir.1979) (per curiam). However, we must recognize that "expert testimony is limited by the requirements of relevancy and by the trial court's traditional discretion to prevent prejudicial or confusing testimony." *Agard,* 117 F.3d at 704; *see also United States v. Onumonu,* 967 F.2d 782, 786 (2d Cir.1992).

■ Earlier this year we summarized the test for determining whether a limitation on the right to present witnesses rises to the level of a constitutional violation:

[W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard [of *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ].

*Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir.2000) (alterations in the original) (citations omitted); *see also Agard,* 117 F.3d at 705 (same).

### 3. Application

■ In analyzing the reasonableness of a trial court's exclusion of evidence, we must examine the stated reasons for the exclusion and "inquire into possible state evidentiary law errors" that may have deprived the petitioner of a fair trial. *Jones,* 229 F.3d at 120; *see also Agard,* 117 F.3d at 704. Many of the reasons given by the state courts for excluding the expert testimony in this case are quite flimsy. For instance, the trial court reasoned that Dr. Thurber should be excluded because he has "never been [previously] qualified as an expert in this state." This rule appears to us to be illogical because it would preclude any new expert from testifying in New York, no matter what his qualifications and no matter what relevance his testimony has.[6]

■ The trial court's characterization of the expert's proposed testimony as "soft scientific testimony at best" is, at the very least, debatable. While we recognize that there is no absolute unanimity among scholars, "a sufficient consensus exists within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events." *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372, 1379 (N.J.1994) (surveying the authorities). An emerging consensus in the case law relies upon scientific studies to conclude that suggestibility and improper interviewing techniques are serious issues with child witnesses, *see, e.g., Idaho v. Wright,* 497 U.S. 805, 826–27, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Maryland v. Craig,* 497 U.S. 836, 868, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (Scalia, J., dissenting); *Swan v. Peterson,* 6 F.3d 1373, 1382 & n. 9 (9th Cir.1993), *cert. denied,* 513 U.S. 985, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994); *People v. Michael M.,* 162 Misc.2d 803, 618 N.Y.S.2d 171, 177 (N.Y.Sup.Ct.1994); *In re R.M. Children,* 165 Misc.2d 441, 627 N.Y.S.2d 869, 873 (N.Y.Fam.Ct.1995), and that expert testimony on these subjects is admissible, *see, e.g., United States v. Rouse,* 111 F.3d 561, 571–72 (8th Cir.), *cert. denied,* 522 U.S. 905, 118 S.Ct. 261, 139 L.Ed.2d 188 (1997) (approving of the admission of expert testimony on suggestive interviewing techniques and the influence they can have on children's memories); *Guam v. McGravey,* 14 F.3d 1344, 1348–49 (9th Cir.1994) (noting that the defendant could have presented expert testimony on "the susceptibility of children to suggestion"); *see also, e.g., State v. Malarney,* 617 So.2d 739, 740–41 (Fla.Dist.Ct. App.1993); *State v. Sloan,* 912 S.W.2d 592, 596–97 (Mo.Ct.App.1995); *State v. Sargent,* 144 N.H. 103, 738 A.2d 351, 353–54 (N.H.1999); *People v. Alvarez,* 159 Misc.2d 963, 607 N.Y.S.2d 573, 574 (N.Y.Sup.Ct. 1993); *State v. Gersin,* 76 Ohio St.3d 491, 668 N.E.2d 486, 487–88 (Ohio 1996); *State v. Kirschbaum,* 195 Wis.2d 11, 535 N.W.2d 462, 466–67 (Wis.Ct.App.1995).

■ We also disagree with the trial court's reasoning that no foundation was laid for the influence of suggestive questioning because "Mr. Washington was ac-

---

6. Dr. Thurber appears to be well-qualified. *See State v. Wright,* 116 Idaho 382, 775 P.2d 1224, 1228 (Idaho 1989) (noting the testimony of Dr. Thurber), *judgment affirmed, Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

cused by the child by the time this case gets to law enforcement." On appeal, the Appellate Division overstated this finding by noting that "the child revealed the incident prior to any prodding or questioning by anyone." *Washington*, 238 A.D.2d at 264, 657 N.Y.S.2d 24. Having carefully reviewed the trial transcript, we can only conclude that these determinations are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994).[7] The sole basis for these findings is the testimony of Jane:

Q: Okay. Now, [Jane], who was the very first person you told?

A: My grandmother.

Q: Your grandmother?

A: Yes.

Q: That's the grandmother you live with now with [sic] and your mommy, Miss Jamison?

A: Yes.

Q: What did you tell her?

A: I told her everything that I said.

Q: Say it again, [Jane]?

A: I told her everything that I said.

Q: Okay. Did you tell her everything you just told us?

A: Yes.

This testimony does not support the findings of the trial court and the Appellate Division for several reasons. First, the trial court appears to have admitted this testimony only as "prompt outcry" evidence admissible to corroborate the allegation that a sexual assault took place. *See, e.g., People v. McDaniel*, 81 N.Y.2d 10, 17, 611 N.E.2d 265, 595 N.Y.S.2d 364 (1993) (holding that evidence of a prompt outcry can be admitted but that "only the fact of a complaint, not its accompanying details, may be elicited"). Since the trial court only admitted the testimony for the purpose of establishing the bare fact that Jane complained of sexual abuse, the testimony does not support a finding that Jane named her father as her attacker. Even if the content of her statements is fully credited, the questioning by the prosecutor and Jane's responses do not establish either when Jane told Ms. Jamison that her father abused her[8] or whether Jane named her father prior to suggestive questioning by Ms. Jamison or someone else.[9]

Even if the trial court was correct that Jane named her father as her attacker prior to being questioned by law enforcement, that finding would only be sufficient to limit the scope of the expert testimony, not exclude it entirely. Although there would be no basis for the expert to testify about the interviewing techniques and anatomically correct dolls used by law enforcement, expert testimony about the suggestibility of children in general would still be relevant because the petitioner's theory of the case was

---

7. As discussed above, we are applying the more favorable pre-AEDPA standards to the petitioner's claim only to demonstrate that under either standard of review, the denial of his petition must be affirmed.

8. Jane did testify that Ms. Jamison was the first person that she told about the abuse. However, the follow-up questions by the prosecutor were entirely open-ended about timing, and Jane's responses therefore do not establish a time-frame for her statement to Ms. Jamison that her father was the one who abused her.

9. Because the questioning did not establish a time frame for Jane's prior consistent statement, *see supra* n. 8, and did not establish whether the statement was made before the onset of potentially suggestive questioning, no foundation was laid to admit the testimony under the exception that allows a prior consistent statement to rebut a claim of recent fabrication. *See People v. Harris*, 242 A.D.2d 866, 867, 662 N.Y.S.2d 965 (4th Dep't 1997) ("[I]n order for that exception to apply, the prior consistent statement must have predated the motive to falsify.").

that Jane was suggestively questioned by her mother and perhaps also her godmother prior to any contact with law enforcement.

 Nor are we persuaded by the trial court's reasoning that the expert testimony was inadmissible because it improperly commented on the credibility of a witness. The district court recognized that the trial judge failed to distinguish between "credibility (the jury's assessment of whether a witness is telling the truth) and reliability (whether the witness's perception or memory is accurate)." *Washington,* 90 F.Supp.2d at 389. There is no question that under New York law, a witness can testify about factors affecting the reliability of another witness, as long as he or she avoids commenting directly on the credibility of the witness. *See People v. Hudy,* 73 N.Y.2d 40, 57, 535 N.E.2d 250, 538 N.Y.S.2d 197 (1988), *abrogated on other grounds, Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000); *People v. Parks,* 41 N.Y.2d 36, 47–48, 359 N.E.2d 358, 390 N.Y.S.2d 848 (1976); *In re Sanchez,* 141 Misc.2d 1066, 535 N.Y.S.2d 937, 940 (N.Y.Fam.Ct.1988); *see also People v. Lee,* 96 N.Y.2d 157, 726 N.Y.S.2d 361, 750 N.E.2d 63, 2001 N.Y. Lexis 1061 (N.Y.2001).

Another reason cited by the Appellate Division for excluding the evidence was that the issue of suggestibility was "the subject of proper jury instructions." *See Washington,* 238 A.D.2d at 264, 657 N.Y.S.2d 24. Having reviewed the record carefully, we can only conclude that the Appellate Division was simply mistaken.[10]

 In addition to analyzing the soundness of the state courts' reasons for excluding the evidence, the case law discussed above concerning the right to present a meaningful defense teaches that the strength of the prosecution's case must also be analyzed because "[i]n a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt'" and raise the exclusion of the evidence to an error of constitutional proportions. *Jones,* 229 F.3d at 120; *see also Agard,* 117 F.3d at 705 (same). The petitioner has not formally challenged the sufficiency of the evidence used to convict him—and in fact raises no other claim besides the one concerning the exclusion of his expert witness. Given Jane's testimony, such a challenge would have failed because a federal habeas court must view the evidence in the light most favorable to the prosecution. *See Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995); *Gruttola v. Hammock,* 639 F.2d 922, 927–28 (2d Cir.1981). Nevertheless, we would be remiss if we did not note that there were several troubling aspects of this trial and the evidence against the petitioner.

The prosecution introduced no physical evidence tying the petitioner to the crime. Moreover, there was very little corroboration of the events in Jane's story. Even though Jane's sister, three cousins, and the petitioner's mother were in the apartment on the night the rape allegedly took place, the prosecution did not call any of these

---

**10.** In the trial court's instructions on how to evaluate the testimony of witnesses, the court stated that "[i]n deciding the credibility, that is the believability, of any particular witness, you may use the same test used in your everyday affairs.... Among the factors to be taken into account ... are the interest or lack of interest the witness has in the outcome of the case. Any bias or prejudice the witness may have. The age, the appearance, the manner in which the witness testified. The opportunity that the witness had to observe the facts testified to...." The brief reference to "age" certainly does not convey the defense theory about suggestibility caused by improper interviewing techniques.

witnesses to corroborate Jane's testimony that when visiting her father she generally slept in the bedroom with the other young children, but that on the night of the rape her father brought her into the living room to sleep with him. In addition, the medical evidence raises the possibility that the sexual abuse took place after the arrest of the petitioner and his incarceration at Riker's Island. The prosecution's physician offered largely unconvincing testimony.

Although noting these concerns, the conclusion we reach as to the one issue before us, the exclusion of the expert testimony, is nonetheless straightforward. We hold that the exclusion of the expert testimony does not rise to the level of constitutional error because, in the context of this case, the admission of the testimony would not have created an "otherwise non-existent" reasonable doubt about the petitioner's guilt. *Jones*, 229 F.3d at 120; *see also Agard*, 117 F.3d at 705 (same). Having carefully reviewed the record, we believe that the issues relating to the potential suggestibility of the young witness were presented to the jury in several different ways. Defense counsel gave a vigorous summation which clearly and forcefully discussed the theory that Jane's mother and others used suggestive and leading questioning to falsely convince Jane that her father had abused her.[11] To the extent that the prosecutor's summation conflated the issues of witness credibility and reliability and erroneously suggested that the defense theory was that Jane was intentionally telling a knowing lie, we believe that defense counsel's thorough summation was sufficient to dispel any confusion of the jury this caused. The fact that Jane had made inconsistent statements about the incident was presented to the jury by the testimony of the case worker Tolbert and the Assistant District Attorney Moreno. The potentially suggestive influence of her mother was presented by Jane's admission that it was her mother who taught her the word "rape." The jury was well aware of Jane's very young age at the time of the crime. Although we believe the expert testimony was relevant and would have aided the jury, we essentially agree with both the trial court and the Appellate Division that the basic idea that young children can be suggestible is "not beyond the knowledge of the jurors." *Washington*, 238 A.D.2d at 264, 657 N.Y.S.2d 24.[12]

11. The following are excerpts from the summation: "[T]he rehearsed nature of [Jane's] testimony leads us to be distrustful of it. Realize that she's gone over questions and answers, time and time again.... Realize the repeated interviews that this child has undergone, over a two year period, by as many as 8 to 12 people.... And each time, each time the child gave an answer that wasn't congruent or the same with what the expectation of the examiner was, the course was changed, steered over to get her back on track.... [W]e're well aware as to how the way questions are asked and the importance of [who is] asking the questions, in terms of what information comes out. It's never truer than with children. Children want to please the person who is asking them questions. That's common sense. That's what happened here.... And [who is] doing the teaching here? The person most important to [Jane] in her whole life, her own mother.... The result of this combination of rehearsals and repeated performance, plus the instruction by the mother results in the interview, the questioning process, becoming a learning process for the little girl. The child is taught through the use of questions. She takes the information that is talked about in the question, and applies it to the answer.... She takes that repeated reference to Jeffrey and applies it to the answer. She's merely reciting and repeating what she's learned."

12. However, the proposed testimony could have given a scientific basis to this common intuition, and also would have discussed issues that jurors are likely not familiar with, such as the effect of improper interviewing techniques on child memory and the pitfalls

■ The Appellate Division also reasoned that the exclusion of the testimony was justified because the petitioner was able to put the potential effects of suggestibility before the jury on cross-examination. *See id.* On several occasions, defense counsel tried to get Jane to admit that during prior interviews she had given answers which were inconsistent with her trial testimony and exculpatory toward her father. However, Jane repeatedly denied that she made the prior inconsistent statements. Technically no affirmative evidence was presented to the jury by this questioning, because it is black letter law that questions asked by counsel are not evidence. *See, e.g., United States v. Cudlitz,* 72 F.3d 992, 1002 (1st Cir.1996). The jury was so instructed in this case. However, we recognize that, in context with the other evidence of the victim's inconsistent statements and defense counsel's arguments about suggestibility, defense counsel's unanswered questions about prior inconsistent statements likely alerted the jury to the issue of the reliability of Jane's testimony. *See id.* at 999 ("Of course, the jury was told that the lawyer's questions are not evidence.... But the sting survives such instructions, which is why lawyers ask impeaching questions that they know will produce denials."); *see also Henry v. Speckard,* 22 F.3d 1209, 1215 (2d Cir.), *cert. denied,* 513 U.S. 1029, 115 S.Ct. 606, 130 L.Ed.2d 517 (1994) ("[I]t is entirely open to a party to try to counter his opponent's case by asking questions designed to expose, *inter alia,* an opposing witness's bias. The witness may well answer bias-probing questions in the negative; but the matter of whether her answers should be believed or disbelieved is within the sole province of the jury.").

In combination, the myriad ways in which suggestibility was presented to the jury lead us to conclude that, under the particular facts of this case, the admission of the proposed expert testimony would not have created an "otherwise non-existent" reasonable doubt about the petitioner's guilt.

CONCLUSION

We find that the state court did not commit an error of constitutional dimensions by excluding the expert testimony. Therefore, whether we review his federal claim under AEDPA or pre-AEDPA standards, we must affirm the district court's denial of Mr. Washington's petition for a writ of habeas corpus.

CALABRESI, Circuit Judge, concurring:

I agree that the petitioner's habeas claim fails under pre-AEDPA standards of review. And I also concur that we should not, given the particular history of this case, [*see infra* at 65], decide today which standard of review applies. I therefore join the panel opinion. I write separately, however, to explain my view that, though correct in delaying a decision, we do State courts no favor by declining to determine, and as soon as possible, that the pre-AEDPA standard of review should indeed be applied in cases like this one—cases, that is, in which State courts have rejected a petitioner's federal constitutional claim without specifically addressing it (even if only by citing to federal case law or to

---

of the use of anatomically correct dolls. *Cf. People v. Taylor,* 75 N.Y.2d 277, 288, 552 N.E.2d 131, 552 N.Y.S.2d 883 (1990) ( "We have upheld the admission of expert testimony [on "sexually abused child syndrome" and "battered child syndrome"] in these child

abuse cases despite the fact that childrearing and family life are familiar to the lay juror because the dynamics of sexually and physically abusive relationships within a family are not as familiar.").

State court decisions that apply federal law).

The AEDPA requires federal courts hearing habeas petitions brought by persons incarcerated "pursuant to the judgment of a State court" to give deference to the State court judgments they review. 28 U.S.C. § 2254(d). Specifically, the AEDPA mandates that "a writ of habeas corpus ... shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Hence, where a habeas petitioner's claims have received an "adjudicat[ion] on the merits" and, as a result of that adjudication, have been rejected by a State court, the AEDPA commands that federal courts yield to the state court decision, and do so even in some instances where that decision is legally incorrect. Federal courts must do this rather than undertake an independent, *de novo* review of the claim's merits. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

One of the Congress's principal purposes in adopting this deferential standard of review was to recognize the independent stature of State courts and to accord State court adjudications respect. This purpose is clearly revealed both on the face of the AEDPA and in multiple statements made by the statute's congressional proponents. Thus Senator Hatch stated that the deferential standard of review imposed by the AEDPA:

simply ends the improper review of State court decisions. After all, State courts are required to uphold the Constitution and to faithfully apply Federal laws. There is simply no reason that Federal courts should have the ability to virtually retry cases that have been properly adjudicated by our State courts.

142 Cong. Rec. S3446–02, 3447 (1996). And Representative Hyde said that AEDPA deference:

is given to State courts' legal decisions if they are not contrary to established Supreme Court precedent. That is to avoid relitigating endlessly the same issues. There is a system of State courts. We give them deference, provided their decisions are not contrary to Supreme Court precedent.

142 Cong. Rec. H2247–01, 2249 (1996).

But in spite of these sympathetic purposes, the AEDPA runs the risk of imposing a heavy, and sometimes unwanted and unmanageable, burden on State courts. Specifically, if AEDPA deference were deemed automatically and universally to apply, then that law would require extremely busy State court judges to figure out what can be very complicated questions of federal law at the pain of having a defendant incorrectly stay in prison should the State court decision of these complex questions turn out to be mistaken (but not unreasonably so). Indeed, under such a reading of the AEDPA, the only alternative to this outcome would be the highly undesirable one of having federal courts reviewing State court decisions on habeas frequently declare such decisions to be not just mistaken but also unreasonable. Assuming, as we surely should, that federal courts will not do this,[1] State courts would

---

1. They will, of course, do so from time to time. *See, e.g., Penry v. Johnson*, —— U.S. ——, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001)

(finding objectively unreasonable a State court determination of the constitutional ade-

inevitably be led to do a lot of work on all federal questions, no matter how difficult, in order to avoid mistaken, but not unreasonable, decisions. And they would do so regardless of whether they wished to spend the time arriving at deeply thought out judgments on such hard federal questions.

In contrast, a reading of the AEDPA under which AEDPA deference does not apply where a State court has rejected a petitioner's claim without expressly mentioning its federal aspects allows State courts to avoid this burden. It enables State courts *to choose* whether or not they wish to take on the burden and be deferred to. It does this by giving them a simple form of words—for example a specific reference to the law governing a petitioner's federal constitutional claims—through which they can signal their choice. Under this interpretation, State courts that wish fully to evaluate federal claims need only indicate that they have done so, and their decisions will be deferred to. Conversely, State courts that believe that their energy and resources are better employed elsewhere can remain silent without having the AEDPA impose on them the burden (and all the consequences) of being treated as if they have given the in depth consideration that AEDPA deference implicates. And they can make this docket controlling choice on a case by case basis.

The rule that State court rejections of a petitioner's federal constitutional claims receive AEDPA deference only where they make specific reference to these claims is, therefore, no empty formalism. It can, instead, be a substantial and appropriate part of the solution to the problem of coordinating the activities of the two structures of independent courts that characterize our federal system. Nor does this rule at all infringe on the freedom of State courts by "impos[ing] on [them] the responsibility for using particular language in every case in which a state prisoner presents a federal claim." *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Rather than "dictating to state courts that they must issue opinions explicitly addressing the issues presented or else face 'second guessing' by the federal courts," *Capellan v. Riley,* 975 F.2d 67, 72 (2d Cir.1992), the rule that AEDPA deference applies only where State courts have signaled that they have considered a petitioner's federal constitutional claim presents State courts with a powerful linguistic device by means of which they can command deference concerning the issues they wish to decide, and pass on for *de novo* review the issues they prefer to avoid, or to treat less fully. In this way, it permits them to exercise that control over their judicial resources which a true respect for state sovereignty requires.[2]

---

quacy of jury instructions that led to the imposition of a sentence of death).

**2.** *Cf. Printz v. United States,* 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding that the Congress may not commandeer State executive officers to execute federal laws); *New York v. United States,* 505 U.S. 144, 188, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that the Congress may not order state legislatures to enact or enforce a federal regulatory program). State courts, by contrast, can be compelled to apply federal law. *See Testa v. Katt,* 330 U.S. 386, 394, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *see also Alden v. Maine,* 527 U.S. 706, 752, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Although Congress may not require the legislative or executive branches of the States to enact or administer federal regulatory programs, it may require state courts of adequate and appropriate jurisdiction to enforce federal prescriptions insofar as those prescriptions relate to matters appropriate for the judicial power") (internal quotation marks, citations, and brackets omitted). Nevertheless, due regard for State sovereignty suggests exhibiting care and restraint

Of course, even though this rule comports with the spirit underlying the AEDPA, we would be powerless to adopt it if the text of the AEDPA mandated otherwise. We would have to reject this approach if the AEDPA required federal courts hearing habeas petitions to defer to State court decisions in all cases, regardless of whether the State courts that issued the decisions wished to be given such deference. But the approach to AEDPA deference laid out above has been adopted by the Third Circuit.[3] And, as one view noted in the panel opinion points out, [*see supra* at 53–54], this approach is consistent with the text of the AEDPA itself,[4] and also coheres with the views expressed by at least six justices in *Williams v. Taylor.*[5] All this demonstrates that, at the very least, the AEDPA is ambiguous on this point, and where the text of a statute is ambiguous, courts interpreting the statute should adopt the construction that best comports with the intent of the Congress that enacted the statute. *See Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1985); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S.

384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, *J.*, concurring). And in this situation that purpose is unambiguously effectuated by the construction of the AEDPA proposed above.

Of course, given the unanimous agreement of the panel that the petitioner's claim fails even under non-deferential, pre-AEDPA review, any statement—as to which rule applies when State courts make no reference to the federal grounds for their decision—would in this case be dicta. Nevertheless, as the Supreme Court has explained in the context of qualified immunity, appellate courts may and often should establish the existence of constitutional rights even where they ultimately deny a plaintiff's damages action on the ground of qualified immunity, because constitutional dicta can be appropriate when it serves to clarify the constitutional principles that govern official conduct. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Wilkinson v. Russell,* 182 F.3d 89, 112–13 (2d Cir.1999) (Calabresi, *J.*, concurring) (discussing the *Sacramento* rule).[6] A

---

in imposing such burdens even on State courts.

**3.** *See Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir.2000), *cert. denied,* — – ——, 121 S.Ct. 1365, 149 L.Ed.2d 293 (2001); *but see Bell v. Jarvis,* 236 F.3d 149, 163 (4th Cir. 2000) (*en banc*) and *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999) (both holding that AEDPA deference applies to a State court decision of a petitioner's federal constitutional claim regardless of whether or not the State court specifically referred to the federal law governing this claim).

**4.** The procedure the AEDPA commands federal habeas courts to follow—which involves examining State court decisions in order to determine which clause of § 2254(d)(1) to apply, and in particular whether the decisions were (a) "contrary to" or (b) "an unreasonable application of" clearly established federal law—cannot readily be performed if the

State court does not (in one way or another) identify the rule of law under which it acted.

**5.** *See Williams,* 529 U.S. at 394, 395, 397–98, 120 S.Ct. 1495 (opinion of Stevens, *J.*); *id.* at 414–16, 120 S.Ct. 1495 (opinion of O'Connor, *J.*); and *id.* at 417–19, 120 S.Ct. 1495 (opinion of Rehnquist, *C.J.*) (all analyzing the reasoning employed by the State court in ways that would have been impossible if the State court had not identified the federal precedents under which it acted).

**6.** The Ninth Circuit referred to this rule in the context of the AEDPA, and held that even where a federal court denies habeas on the ground that a State's court's decision was not unreasonable, it should nevertheless also decide whether the State court's decision was mistaken *simpliciter,* in order to "promote[ ] clarity in ... constitutional jurisprudence" and thereby "provide[ ] guidance for state courts." *See Tran v. Lindsey,* 212 F.3d 1143,

signaling device is of no use unless the sender of the signal is informed of how its signs will be interpreted, and the sooner the better. For that reason—and in order to clarify the law for the benefit of State courts, so that they might make use of the structures of deference that the AEDPA creates—I wish I could conclude that we should, in this case, establish as correct the interpretation of the AEDPA argued for above, even though that reading would not be outcome-determinative.

Nevertheless, I join the rest of the panel in declining to do so today. In order to address what is an undoubtedly difficult question, we would need the benefit of additional full and careful briefing and argument on the proper application of AEDPA deference in the absence of a State court signal. Furthermore, since an earlier version of the panel opinion has made plain that the petitioner's habeas claim would fail even under the pre-AEDPA standard of review, requesting supplemental briefing on the questions raised in this concurrence would not cure the problem. For the petitioner (and his able counsel) would have no live interest in the outcome of the second round of briefing. Under the circumstances, we have no choice but to allow the issue of the correct interpretation of the AEDPA to await a decision by a future panel. Accordingly, while recognizing the costs of such delay, I concur fully in the panel opinion.

1155 (9th Cir.2000). In *Bell,* 236 F.3d at 162, the Fourth Circuit rejected the *Tran* rule on the ground that the AEDPA allows federal courts to grant habeas only where State courts misapply *Supreme Court* rather than Circuit Court precedent.